**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**UNITEDHEALTHCARE INSURANCE COMPANY, UNITEDHEALTHCARE OF FLORIDA, INC., AND UNITEDHEALTHCARE SERVICES, INC.,**

**Plaintiffs,**

**VS.**

**SKY TOXICOLOGY, LTD., SKY TOXICOLOGY LAB MANAGEMENT, LLC, FRONTIER TOXICOLOGY, LTD., FT LAB MANAGEMENT, LLC, HILL COUNTRY TOXICOLOGY, LTD., ECLIPSE TOXICOLOGY, LTD., ECLIPSE LAB MANAGEMENT, LLC, AXIS DIAGNOSTICS, INC., DR. WILLIAM "WADE" WHITE, LANCE HUPFELD, BRADLEY WEST, ELEMENTS BEHAVIORAL HEALTH, INC., SOUTH FLORIDA RECOVERY CENTER, LLC, SOLID LANDINGS, LLC, KORY AVARELL, STEPHEN FENNELLY, ELIZABETH PERRY, FERRIEL CONSULTING GROUP, INC., JEFFREY L. COHEN, LLJ CONSULTANTS, INC., AND DOES 1-150,**

**Defendants.**

**Case No.**

**JURY DEMAND**

# COMPLAINT

Plaintiffs UnitedHealthcare Insurance Company, UnitedHealthcare of Florida, Inc., and UnitedHealthcare Services, Inc. (collectively, "United") file this Complaint against Defendants Sky Toxicology, Ltd., Frontier Toxicology Ltd., Hill Country Toxicology, Ltd., Eclipse Toxicology, Ltd., Axis Diagnostics, Inc. (collectively, "Lab Defendants"), Defendants Sky Toxicology Lab Management, LLC, FT Lab Management, LLC, Eclipse Lab Management, LLC (collectively, "General Partner Defendants"), Defendants William "Wade" White, M.D., Lance Hupfeld, Bradley West, and Does 1-20 (collectively, "Individual Defendants"), Defendants Elements Behavioral Health, Inc., Solid Landings, LLC, South Florida Recovery Center, LLC, Kory Avarell, Stephen Fennelly, Elizabeth Perry, Ferriel Consulting Group, Inc., , and Does 21-100 (collectively, "Referring Defendants"), and Defendants Jeffrey L. Cohen, LLJ Consultants, Inc., and Does 101-150, and respectfully show the Court as follows:

## I. NATURE OF ACTION

1. This lawsuit is the product of a fraudulent scheme engineered by the Individual Defendants and implemented through and in conjunction with the other Defendants, which has defrauded United, its plans, and members out of more than $50 million.

2. Individual Defendants, the executives and owners of the Lab Defendants, have utilized Lab Defendants to execute a scheme to defraud private payors, like United, through a pattern of deceptive and unfair trade practices related to health insurance claims for urinalysis (UA) tests.

3. Individual Defendants, and Lab Defendants' agents at Individual Defendants' direction, offer kickbacks to Referring Defendants who are in position to refer, or cause to be referred, large quantities of UA tests to Lab Defendants.

4. To disguise the kickbacks, Referring Defendants "invest" in the Lab Defendants by purchasing limited partnership shares in the lab to which they refer UA tests. The Referring Defendants then receive monthly distributions of tens of thousands of dollars, based on their limited partnership shares. However, if the referrals stop or decrease, Individual Defendants threaten to buy back the Referring Defendants' shares or withhold their monthly distributions.

5. Individual Defendants also encourage, instruct, and demand that Referring Defendants increase the number of UA tests sent to Lab Defendants through the referral of unnecessary and/or unauthorized UA tests.

6. Individual Defendants' scheme depends on (a) the systemic waiver of United's members' payment responsibilities (a practice that Florida law specifically identifies as a species of fraud) and (b) the submission of claims to United that do not disclose the waiver practice.

7. United makes payments to Lab Defendants based on the fraudulent claims and then Individual Defendants funnel the money back to the Referring Defendants and themselves through limited partnership shares in Lab Defendants and/or their respective general partner. Defendants have created and utilize myriad entities to disguise and add layers to the kickback scheme, which is calculated to make tracing funds more difficult.

8. Plaintiffs seek to end to this multi-million dollar scheme by bringing suit not only against Lab Defendants, but also against the Individual Defendants and Referring Defendants that have used the Lab Defendants to enrich themselves at United's expense.

## II. <u>PARTIES</u>

### Plaintiffs

9. Plaintiff UnitedHealthcare Insurance Company, Inc. is a corporation organized under the laws of the State of Connecticut, with its principal place of business in the State of Connecticut. UnitedHealthcare Insurance Company, Inc. fully-insures and administers health plans.

10. Many Florida-based plans provided and administered by UnitedHealthcare Insurance Company, Inc. have been targeted by Defendants' fraudulent scheme. Defendants have caused UnitedHealthcare Insurance Company,

Inc. to make payment on thousands of fraudulent claims related to Florida residents and Florida-based plans.

11. Plaintiff UnitedHealthcare of Florida, Inc. is a corporation organized under the laws of the State of Florida, with its principal place of business in the State of Florida. UnitedHealthcare of Florida, Inc. fully-insures and administers plans.

12. Florida-based plans provided and administered by UnitedHealthcare of Florida, Inc. have been targeted by Defendants' fraudulent scheme. Defendants have caused UnitedHealthcare of Florida, Inc. to make payment on thousands of fraudulent claims related to Florida residents and Florida-based plans.

13. Plaintiff UnitedHealthcare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. UnitedHealthcare Services, Inc. administers plans that are funded by plan sponsors.

14. Many Florida-based plans administered by UnitedHealthcare Services, Inc. have been targeted by Defendants' fraudulent scheme. Defendants have caused UnitedHealthcare Services, Inc. to make or authorize payment on thousands of fraudulent claims related to Florida residents and Florida-based plans. Plans damaged by Defendants' fraudulent and otherwise tortious conduct have assigned the recovery of their funds to UnitedHealthcare Services, Inc.

**Defendants**

15. Defendants utilize multiple corporate entities in an attempt to shield themselves from liability for their fraudulent conduct. Lab Defendants are limited partnerships that perform the UA testing. General Partner Defendants are limited liability corporations that are the general partners of the respective Lab Defendant. Individual Defendants are the core group of individuals who own, operate, manage, and directly participate in the affairs of Lab Defendants and General Partner Defendants. Referring Defendants are the addiction treatment facilities (or their owners) and pain management physicians who refer or cause UA tests to be referred to the Lab Defendants and have direct or indirect ownership interests in the same Lab Defendant to which referrals are made. United expects to add many additional Defendants as other conspirators are revealed during discovery.

***The Lab Defendants***

16. Defendant Sky Toxicology, Ltd. is a limited partnership organized under the laws of the State of Florida that may be served with process through its registered agent, Jeffrey Cohen, at 909 SE 5th Ave #200, Delray Beach, FL 33483. Sky Toxicology, Ltd. was established in 2013 and, according to its website, accepts UA tests exclusively from "Addiction Treatment Facilities."

17. Defendant Frontier Toxicology, Ltd. is a limited partnership organized under the laws of the State of Texas and registered to transact business in Florida

as a foreign limited partnership, which may be served with process through its registered agent, Jeffrey Cohen, at 909 SE 5th Ave #200, Delray Beach, FL 33483. Frontier Toxicology, Ltd. was established in 2012 and, according to its website, it "is focused exclusively on physician's practices for pain medication monitoring." It operates out of the same address as Sky Toxicology, Ltd.

18. Defendant Hill Country Toxicology, Ltd. is a limited partnership organized under the laws of the State of Texas and registered to transact business in Florida as a foreign limited partnership, which may be served with process through its registered agent, Jeffrey Cohen, at 909 SE 5th Ave #200, Delray Beach, FL 33483. Hill Country Toxicology, Ltd. was established in 2009 and, according to its website, it is "dedicated exclusively to physician's practices for pain medication monitoring."

19. Axis Diagnostics, Inc. is a foreign corporation, organized under Pennsylvania law, authorized to transact business in Florida that may be served with process through its registered agent, Jeffrey Cohen, at 909 SE 5th Ave #200, Delray Beach, FL 33483.

20. Defendant Eclipse Toxicology, Ltd. is a limited partnership organized under the laws of the State of Texas, which may be served with process through its registered agent, Richey Wyatt, 1051 E. Nakoma, Suite 201, San Antonio, TX 78216.

21. Eclipse Toxicology, Ltd. was established in 2015, in anticipation of suits arising out of Individual Defendants' operation of other Lab Defendants and in an effort to hide, shield, shift or otherwise protect assets and operations. For example, Cailey Hesse, an employee of both Eclipse Toxicology, Ltd. and Sky Toxicology, Ltd., states on her resume that is posted online that her job includes transferring accounts, assets, paperwork and supplies from Sky Toxicology, Ltd. to Eclipse Toxicology, Ltd.

***The General Partners***

22. Each Lab Defendant, except for Axis Diagnostics, Inc. and Hill Country Toxicology, Ltd., has a separate limited liability company serve as its respective general partner.

23. Defendant Sky Toxicology Lab Management, LLC, is a limited liability company organized under the laws of the State of Florida that may be served with process through its registered agent, Jeffrey Cohen, at 909 SE 5th Ave #200, Delray Beach, FL 33483. Sky Toxicology Lab Management, LLC is Sky Toxicology, Ltd.'s general partner and is thus liable for the limited partnership's acts.

24. Defendant FT Lab Management, LLC is a limited liability corporation organized under the laws of the State of Florida that may be served with process through its registered agent, Jeffrey Cohen, at 909 SE 5th Ave #200, Delray Beach,

FL 33483. FT Lab Management, LLC is Frontier Toxicology, Ltd.'s general partner and is thus liable for the limited partnership's acts.

25. Defendant Eclipse Lab Management, LLC is a limited liability corporation organized under the laws of the State of Texas that may be served with process through its registered agent, Richey Wyatt, at 1051 E Nakoma St., Suite 201, San Antonio, TX 78216. Eclipse Lab Management, LLC is Eclipse Toxicology, Ltd.'s general partner and is thus liable for the limited partnership's acts. Eclipse Lab Management, LLC shares its address with Sky Toxicology, Ltd.

***The Individual Defendants***

26. Defendant Bradley West is the Chief Operating Officer and is directly involved in the management and operation of each Lab Defendant. He is a member and manager of each General Partner Defendant. He is, individually, Hill Country Toxicology, Ltd.'s general partner. He is also an officer and/or director of Axis Diagnostics, Inc.

27. Defendant Lance Hupfeld is the Chief Sales Officer and is directly involved in the management and operation of each Lab Defendant. He is a member and manager of FT Lab Management, LLC. He, and/or a company he controls, LLJ Consultants, Inc., is a member and manager of Sky Toxicology Lab Management, LLC. He is an officer and/or director of Axis Diagnostics, Inc.

28. Defendant Dr. William "Wade" White is the Chief Executive Officer and is directly involved in the management and operation of each Lab Defendant. He is also a manager and member of each General Partner Defendant. He is, individually, Hill Country Toxicology, Ltd.'s general partner. He is also an officer and/or director of Axis Diagnostics, Inc. He has a provider identification number issued by U.S. Centers for Medicare and Medicaid Services (1467425686), under which Lab Defendants have submitted claims for UA tests and which has been listed as a referring provider for claims submitted under Lab Defendants' own provider identification number.

29. Defendants Doe 1-20 are individuals who were directly involved in the operation and management of Lab Defendants or Lab Defendants' related entities and in the execution of the scheme to defraud United through unfair and deceptive trade practices.

***Referring Defendants***

30. Defendant Elements Behavioral Health, Inc. is a Delaware corporation, with its principal place of business in California and may be served through its registered agent at 2710 Gateway Oaks Dr., Ste. 150-N, Sacramento, CA 95833. It owns or owned more than 20 limited partner shares in Sky Toxicology, Ltd., and received kickbacks from Sky Toxicology, Ltd. in excess of $600,000 per month. It owns and operates treatment facilities in Florida.

31. Defendant South Florida Recovery Center, LLC is a Florida limited liability corporation and may be served through its registered agent, Nicholas Ferriel, at 6869 Bayshore Drive, Lantana, FL 33462. Defendant South Florida Recovery Center, LLC sent UA tests from its facility to Sky Toxicology, Ltd. in exchange for kickbacks, which were funneled through Ferriel Consulting Group, Inc.

32. Defendant Solid Landings, LLC is a Delaware limited liability corporation, with its principal place of business in California that may be served at 29000 Bristol St., Suite B-300, Costa Mesa, CA 92626. Solid Landings, LLC forged medical authorizations for UA confirmation tests by using multiple physicians' signatures without their consent or permission and referred those unauthorized UA tests to Sky Toxicology, Ltd. in exchange for kickbacks to its owners, Defendants Stephen Fennelly and Elizabeth Perry.

33. Defendant Kory Avarell, a citizen of California, owns or operates Above It All and owned at least two limited partnership shares of Sky Toxicology, Ltd. and received kickbacks from Sky Toxicology, Ltd. in excess of $30,000 per month.

34. Defendant Elizabeth Perry, a citizen of Texas, owns or operates Solid Landings, LLC and owned at least two limited partnership shares of Sky

Toxicology, Ltd. and received kickbacks from Sky Toxicology, Ltd. in excess of $30,000 per month.

35. Defendant Stephen Fennelly, a citizen of California, owns or operates Solid Landings, LLC and owned at least two limited partnership shares of Sky Toxicology, Ltd. and received kickbacks from Sky Toxicology, Ltd. in excess of $30,000 per month.

36. Defendant Ferriel Consulting Group, Inc. is a Florida corporation and may be served through its registered agent, Nicholas Ferriel, at 4000 S. 57th Avenue, Suite 203, Greenacres, FL 33463. Defendant Ferriel Consulting Group, Inc. owns or owned at least three limited partnership shares of Sky Toxicology, Ltd. and is or was the conduit through which kickbacks were distributed in exchange for referrals of UA tests from South Florida Recovery, LLC to Sky Toxicology, Ltd.

37. Defendant LLJ Consultants, Inc. is a Texas corporation and may be served through its registered agent at 713 Coomes Pl., Cedar Park, Texas 78613. Defendant LLJ Consultants, Inc. is Defendant Lance Hupfeld's corporation, which is a member of Sky Toxicology Lab Management, LLC and is used to funnel kickbacks to Florida physicians who refer UA tests to Sky Toxicology, Ltd.

38. Defendant Jeffrey Cohen is a citizen of Florida and may be served at 909 SE 5th Ave #200, Delray Beach, FL 33483. Defendant Cohen has conspired

with other Defendants to unlawfully obtain funds from United through the commission of deceptive and unfair practices and has taken overt acts in furtherance of such conspiracy. Defendant Cohen is a member and owns 5% of Sky Toxicology Lab Management, LLC.

39. Defendants Doe 21-150 are addiction treatment facilities, owners of addiction treatment facilities, physicians, or physicians' practice groups that have directly or indirectly invested in Lab Defendants and agreed to participate in Lab Defendants' scheme through the submission of unnecessary or unauthorized UA confirmation tests to Lab Defendants in which they have directly or indirectly invested.

## III. JURISDICTION AND VENUE

40. This Court has personal jurisdiction over Defendants in this action, and personal jurisdiction is proper before this Court pursuant to Fla. Stat. §§ 48.193(1)(a) and (b) because Defendants operate, conduct, engage in and carry on business in Florida, have committed, and/or have conspired to commit, and/or have participated in a conspiracy that has committed tortious acts within the state of Florida, targeted towards Florida residents, businesses, or interests. Personal jurisdiction is also proper before this Court pursuant to Fla. Stat. § 48.193(2) because Defendants engage in substantial and not isolated activities within Florida.

41. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, United asserts claims in this case that arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq*., as United acted as an ERISA fiduciary in administering claims submitted by Lab Defendants as non-network providers, and United, as the claims administrator, seeks to recover overpayments that were made in connection with employee health and welfare benefits plans that fall within the scope of ERISA.

42. This Court has jurisdiction over United's remaining claims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

43. Venue is proper in the Southern District of Florida pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action occurred in the Southern District of Florida. Specifically, many of United's health plans and members can be found within this district, several Defendants are located in this district, and Referring Defendants have facilities in in this district.

## IV. FACTUAL BACKGROUND

### Health Plans

44. United is a health services company that provides health and welfare benefit plans to millions of individuals.

45. Individuals who are part of United's plans are known as "members."

46. United aims to provide its members with comprehensive healthcare at affordable costs, from well-qualified medical professionals, at professionally staffed and accredited medical facilities.

47. United is the claims administrator for all of these plans and, as the authorized claims-review fiduciary of each of the plans at issue, exercises discretionary authority over plan assets and plan administration, including whether to issue reimbursements in response to claims submitted by healthcare providers, such as Lab Defendants.

48. The majority of United's plans are governed by ERISA, in that they are non-governmental employee health and welfare benefit plans maintained by employers for the benefit of their employees and do not fall within any ERISA safe-harbor provision.

49. With respect to the ERISA plans at issue, United exercised its discretion as an ERISA fiduciary and has administered claims and/or appeals on behalf of such plans associated with the benefit claims on which it seeks recovery.

50. Regardless of the type of plan funding, and regardless of whether the plan is governed by ERISA, United exercises its discretion as a claims administrator of each of the plans associated with claims on which United seeks recovery and is authorized, or has been assigned the right, to recover overpayments on the plans' behalf.

51. United offers a variety of different plans, but the types of plans that have been harmed by Defendants' conduct are (i) administrative services only ("ASO") plans and (ii) fully-funded plans.

***ASO Plans***

52. ASO plans are funded by their respective sponsor, generally an employer, and the employer-sponsor's employees' contributions.

53. United provides extensive administrative services for its ASO plans, pursuant to Administrative Services Agreements it has with the ASO-plan sponsors. The Administrative Services Agreements assign to United the authority, responsibility, and discretion to determine eligibility for coverage, make factual determinations, make coverage determinations, conduct a full and fair review of each denied claim, process and make payment on claims submitted by healthcare providers, adjudicate plan members' appeals relating to adverse benefits decisions, and to pursue overpayments, fraud, waste, and abuse, on behalf of the plan.

54. Moreover, one of United's administrative responsibilities under the Administrative Services Agreements is the monitoring and pursuit of overpayments and fraud that involve the plans' funds, including taking legal action on behalf of the ASO plans to recover such funds. The relevant Administrative Services Agreements state: "You delegate to [United] the discretion and authority to use such procedures and standards, including the authority to undertake actions, including legal actions, which have the largest impact for the largest number of customers."

55. United's ASO plans require members to pay any amount identified as a member responsibility, including coinsurance or deductibles, directly to providers and expressly reserve the right to recover payments made where member payment responsibilities were not paid or not required to be paid.

56. Defendants have defrauded United's ASO plans out of more than $40 million.

***Fully-Insured Plans***

57. United's fully-insured plans are funded by United and, like its role with ASO plans, United is also the administrator of these fully-funded plans.

58. United's fully-insured plans provide:

> You are responsible for paying, directly to your provider, any amount identified as a member responsibility, including Copayments, Coinsurance, any deductible and any amount that exceeds Eligible Expenses.

> ***
>
> If we pay Benefits for expenses incurred on account of a Covered Person, that Covered Person, or any other person or organization that was paid, must make a refund to us if any of the following apply: All or some of the expenses were not paid by the Covered Person or did not legally have to be paid by the Covered Person.

*See* Exhibit A, Representative Certificate of Coverage, at pp. 55, 59.

59. Defendants have defrauded United's fully-insured plans out of more than $10 million.

***Plan Documents and Terms***

60. All of United's plans function in accordance with plan documents, which establish, among other things, the rights and responsibilities of both the plan and the members of the plan.

61. All of the relevant plans require members to satisfy their payment responsibility for services rendered in order for those services to be covered and eligible for benefits paid by the plan.

62. United's plans' terms identify members' payment responsibilities for services, which generally consist of a combination of a copay (*e.g.*, a flat amount per visit to be paid by a member), coinsurance (*e.g.*, a percentage of the eligible expenses, determined by United, to be paid by a member), and/or a deductible (*e.g.*, a cumulative amount of money that a member pays before his/her benefits under the plan are triggered).

63. Members' payment responsibilities for services are an important check on waste. Since it is members, not their plans, who control the services they receive, members' payment responsibilities sensitize members to unnecessary or overpriced services, resulting in more affordable healthcare for all members (as well as healthcare consumers, generally).

64. United's plans allow members the flexibility to choose to obtain healthcare services from either network providers or non-network providers.

65. Network providers are providers with whom United has entered into an agreement pursuant to which United has agreed to reimburse providers at specified rates for medical services provided to United's members. In turn, network providers agree to provide services to United's members, accept reimbursement at specified rates, and not bill United's members for any other amounts, except under limited circumstances.

66. Non-network providers have not entered into a provider agreement with United. United has not agreed to pay non-network providers any predetermined amounts for services provided to United's members. Non-network providers charge and bill United and plan members at rates set by the provider, which are almost always higher than the contractual rates agreed to between United and network providers.

67. Generally, a member's payment responsibilities (*e.g.*, co-payments, deductibles, and co-insurance) are lower when utilizing network providers than non-network providers. This allows United's members to obtain medical services from in-network providers with minimal financial risk or out-of-pocket expense.

68. United's plans' terms also provide that non-network charges submitted for payment to United will be paid as a percentage of the "Eligible Expenses," which is determined by United.

69. A member's coinsurance responsibility is, correspondingly, calculated from the Eligible Expenses.

70. Lab Defendants are all non-network providers and thus all claims submitted by Lab Defendants to United are for non-network services.

71. The charges billed by Lab Defendants are an important and material component of United's analysis and determination of the payments that are owed on claims.

**Urinalysis Testing**

72. UA tests are commonplace in modern medicine and are utilized as important tools to, among other things, prevent drug abuse, prevent the illegal sale of prescription drugs, and prevent potentially harmful drug interactions.

73. Generally, when UA testing is necessary, a patient's urine specimen is split into two samples. One sample is for a qualitative analysis, often done on-site

at a provider's office and referred to as a Point-of-Care Test ("POCT"). This type of test is used as a basic indicator of whether a substance is present in a person's system.

74. When a POCT results in a positive test, providers refer the second sample to an outside lab for "confirmation testing."

75. Confirmation testing utilizes more reliable technology than POCT and provides a more technically sound qualitative result or, where appropriate, a quantitative analysis, which shows not only whether a drug is in a urine specimen, but also how much of that drug is present.

76. Confirmation testing can include tests for a variety of substances, generally grouped together in "panels." For example, one panel may include tests for opiates, barbituates, and marijuana, while another may test for marijuana, amphetamines, and designer drugs.

77. Confirmation testing labs, like Lab Defendants, submit claims to private payors, like United, for benefits on UA tests performed on plan members' urine specimens and private payors make payments to the confirmation testing labs for these services, pursuant to the terms of the members' plans.

78. UA tests are used by a wide variety of healthcare providers, but Lab Defendants receive confirmation test referrals almost exclusively from pain management physicians and addiction treatment facilities.

79. A normal part of a pain management provider's practice is to test their patients' urine to determine, among other things, whether patients are taking their medication or whether patients are taking other drugs that may interact with their prescribed drugs.

80. Likewise, addiction treatment facilities routinely test the urine of individuals at their facilities to determine, among other things, whether those individuals are relapsing or abusing drugs or whether those individuals are taking the drugs they have been prescribed.

81. Addiction treatment facilities operate in conjunction with licensed medical providers. These licensed providers are often associated with multiple facilities.

82. These licensed providers counsel the addiction treatment facilities' patients and prescribe medications. They also review POCTs and authorize UA confirmation testing where it is medically necessary.

83. In order for a UA confirmation test to be covered and eligible for payment from United's plans, an authorized medical provider must order the test and the test must be medically necessary.

**Defendants' Multi-Pronged Scheme to Defraud United**

84. United's fraud investigation unit recently identified Sky Toxicology, Ltd. as a significant outlier against national peer providers, on both a claims-per-member and payments-per-member basis.

85. This identification led United to undertake a deeper investigation into Sky Toxicology, Ltd. and, ultimately, the other Lab Defendants, each of which is owned and operated by the same core of Individual Defendants.

86. United's investigation identified troubling patterns of fraudulent conduct: referral sources – both physicians and facilities – being solicited to, and owning investment interests in labs to which they refer UA tests; facilities referring UA confirmation tests to Lab Defendants without proper authorizations; facilities and providers referring excessive and unnecessary UA tests to Lab Defendants; and the uniform waiver of members' payment responsibilities.

***Prong 1 –Kickbacks to Referral Sources for UA Test Referrals***

87. Individual Defendants induce non-network referrals of UA tests to Lab Defendants by offering kickbacks to Referring Defendants, which come in the form of distributions on "investments" in the Lab Defendant to which the Referring Defendant makes referrals or directs referrals.

88. For example, Referring Defendants are offered limited partnership shares in Sky Toxicology, Ltd. (or Eclipse Toxicology, Ltd.) in exchange for referring UA tests to Sky Toxicology, Ltd. (or Eclipse Toxicology, Ltd.).

89. Likewise, pain management physicians or their practices are offered limited partnership shares in Frontier Toxicology, Ltd., or Hill Country Toxicology, Ltd., or shares in Axis Diagnostics, Inc. in exchange for referring UA confirmation tests to the lab in which the physician or practice invests.

90. Individual Defendants offer limited partnership shares for less than $10,000, but inform Referring Defendants that revenue from a share will exceed that amount **every month**. For example, in April 2014, a single limited partnership share of Sky Toxicology, Ltd. provided a monthly distribution of more than $26,000. In May 2014, the same share provided a monthly distribution of nearly $32,000.

91. Similarly, Frontier Toxicology, Ltd. has solicited Referring Defendants by telling them, "Due to the profits we have realized, the distributions were re-adjusted in April. They have now averaged $14,000.00 per month. This is a very sustainable way to add revenue **without adding patient visits**." (Emphasis added.)

92. Individual Defendants control the number of shares made available to Referring Defendants. The more referrals sent by a Referring Defendant, the more shares it is allowed to purchase.

93. Bradley West, Lab Defendants' Chief Operating Officer, is directly involved in negotiations with Referring Defendants regarding the purchase of limited partnership shares and executes Subscription Agreements outlining the purchase of such shares on behalf of Lab Defendants granting such shares.

94. Lance Hupfeld, Lab Defendants' Chief Sales Officer, travels to Florida and brought Florida-based Referring Defendants to Texas to solicit and recruit Referring Defendants to refer UA tests from their facilities to Lab Defendants in exchange for opportunities to purchase limited partnership shares in Lab Defendants. He executes limited partnership Subscription Agreements on behalf of Lab Defendants. He directly participates in setting the price of limited partnership shares and informs Referring Defendants that they can only buy shares commensurate with the level of referrals they provide (or will provide) to Lab Defendants.

95. Dr. White, Lab Defendants' Chief Executive Officer, is also directly involved in setting the price of limited partnership shares and negotiating with Referring Defendants about the purchase of such shares. Lab Defendants

sometimes submit claims for UA tests under his NPI number as the provider or referring provider.

96. Lab Defendants and/or Individual Defendants use “side agreements” with Referring Defendants to funnel kickbacks through other entities, to disguise their fraudulent kickback scheme. For example, Lance Hupfeld has funneled kickbacks to Florida-based Referring Defendants through LLJ Consulting, Inc., which is an entity under his control.

97. Dr. White, Lance Hupfeld, and Bradley West often consulted each other before making decisions regarding adding new limited partners. For example, they held group discussions before rescinding a subscription agreement for limited partnership shares that was originally offered to a Florida-based sales representative.

***Prong 2 – Artificial Increase of Number of Tests (and Resulting Claims)***

98. Once a Referring Defendant purchases limited partnership shares in the lab to which it refers UA confirmation tests, Individual Defendants work to ensure that the referrals are maximized by (i) encouraging Referring Defendants to submit UA tests that were never ordered or authorized by a licensed provider, (ii) encouraging Referring Defendants to submit UA tests that are not medically necessary, (iii) requiring Referring Defendants to order UA test panels that are not

medically necessary, and (iv) threatening to buy back a Referring Defendant's limited partnership shares if referral minimums are not met.

99. Dr. White, Lance Hupfeld, and Bradley West each visited and communicated with Referring Defendants in Florida or brought Florida-based Referring Defendants to Texas and pressured them to refer more UA tests to the respective Lab Defendant in which each Referring Defendant owned limited partnership shares.

100. Lab Defendants and Individual Defendants closely monitor the number of UA tests referred or caused to be referred by each Referring Defendant through a daily "count report," and verify that referral volumes are commensurate with the number of limited partnership shares held by each Referring Defendant.

101. Bradley West controlled the monthly distribution payments made pursuant to the subscription agreements and would instruct administrative employees to withhold distribution checks when a Referring Defendant did not refer a sufficient number of UA tests. When administrative employees would ask Bradley West why checks were not to be issued, he told them "to do what he says to do" and that "they were not paid to ask questions."

102. Lance Hupfeld imposed referral minimums on Referring Defendants and traveled to, among other places, Florida to meet with Referring Defendants,

remind them that they needed to meet the referral minimums, and encourage them to submit unnecessary or unauthorized claims.

103. To further inflate the number of claims and charges per claim, Lab Defendants, under the direction, control, and management of Individual Defendants, billed United for services not ordered by Referring Defendants, and required Referring Defendants to order custom test panels, which included tests that were not medically necessary and were selected only to maximize the payments from United.

104. United's investigation revealed that facilities or practice groups that own shares of Lab Defendants refer UA tests to Lab Defendants without the authorizing physician ever knowing where the UA test is sent.

105. United's investigation also revealed that Referring Defendants refer UA tests to Lab Defendants under physicians' NPI numbers without those physicians ever authorizing the UA test (or the referral).

106. For example, thousands of UA tests submitted to Sky Toxicology, Ltd. from Solid Landings, LLC's facilities were never ordered by physicians or contained forged physician authorizations. Physicians interviewed by United, who allegedly authorized UA tests on Solid Landings, LLC's patients and referred them to Sky Toxicology, Ltd., informed United that they never authorized any UA tests and that documents claiming otherwise were forged and/or fraudulent.

***Prong 3 – Uniform Waiver of Members' Payment Responsibilities***

107. Individual Defendants' operation of Lab Defendants includes the systematic and routine waiver of United's members' payment responsibilities for UA confirmation tests, a practice specifically prohibited under Florida law and identified as fraudulent under F.S.A. § 817.234 and identified as a fraudulent practice by the Office of Inspector General in Special Fraud Alerts issues on December 19, 1994.

108. Lab Defendants do not provide United's members estimates of charges prior to Lab Defendants' services, do not bill United's members for the services, do not intend to pursue United's members' payment responsibilities for the services, and do not conduct any inquiries regarding United's members' financial status before waiving their payment responsibilities.

109. Lab Defendants, at Individual Defendants' direction, submit claims to United that misrepresent the charges for UA tests, as the charges submitted to United were for amounts that Lab Defendants never intended to recover from United's members.

110. Lab Defendants, at Individual Defendants' direction, intentionally fail to disclose that members' payment responsibilities are waived, which is material information to United's analysis of charges and determination of payments owed on the submitted claims.

111. Lab Defendants, at Individual Defendants' direction, intentionally fail to disclose that the sources of the referrals to Lab Defendants have direct or indirect financial interests in Lab Defendants, which is material information to United's analysis of charges and determination of payments owed on the submitted claims.

112. Individual Defendants' pattern of calculated fraud and unfair and deceptive practices has resulted in skyrocketing out-of-network costs, injuring United's plans and members in Florida, among other states.

113. Since July of 2011, United has made payments in excess of $32.5 million to Sky Toxicology, Ltd., $10 million to Hill Country Toxicology, Ltd., $5 million to Frontier Toxicology, Ltd., $4 million to Axis Diagnostics, Inc., and $150,000 to Eclipse Toxicology, Ltd.

114. Ultimately, Individual Defendants' fraudulent scheme and unfair and deceptive practices have defrauded United, its plans, plan sponsors, and members out of more than $50 million.

115. Lab Defendants have submitted tens of thousands of fraudulent claims to United – far too many to even list as an attachment to this Complaint – however, the details of several hundred claims submitted by each Lab Defendant to United are attached to this Complaint as Exhibits. Claims submitted by Sky Toxicology, Ltd. to United are attached as Exhibit B. Claims submitted by Frontier Toxicology,

Ltd. to United are attached as Exhibit C. Claims submitted by Hill Country Toxicology, Ltd. to United are attached as Exhibit D. Claims submitted by Axis Diagnostics Services, Inc. are attached as Exhibit E. Claims submitted by Eclipse Toxicology, Ltd. to United are attached as Exhibit F.

## V. CAUSES OF ACTION

### COUNT I – Deceptive and Unfair Business Practices

### (Against Lab Defendants)

116. United incorporates each preceding paragraph as if each was fully stated herein.

117. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." The FDUTPA is to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce.

118. An act is unfair under FDUTPA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

119. Lab Defendants engage and have been engaged in trade and commerce in the State of Florida.

120. Lab Defendants have sought out to specifically harm Florida consumers in the execution of their fraudulent scheme.

121. United, its plans, and members are consumers, under FDUPTA.

122. Lab Defendants' business practices are unfair, deceptive, and unconscionable and constitute both *per se* and traditional violations of FDUPTA.

123. Lab Defendants' violations of Florida Statutes §§ 817.234 (false and fraudulent insurance payments), 817.505 (patient brokering), 456.054 (anti-kickback), 483.245 (lab rebates), which are meant to protect public welfare, constitute *per se* violations of FDUPTA.

124. Lab Defendants' routine and systematic waiver of United's members' payment responsibilities is a direct violation of F.S.A. § 817.234. This deceptive and unfair practice caused significant economic harm to United because Lab Defendants' fraudulent insurance claims induced United to make millions of dollars of payments that it was never obligated to make. Each claim submitted by Lab Defendants to United, including those listed in Exhibits B through F, constitutes an independent FDUPTA violation.

125. Lab Defendants' direct and indirect kickbacks to Referring Defendants, which are intended to induce referrals to Lab Defendants, are violations of F.S.A. §§ 817.505, 456.054, and 483.245. This deceptive and unfair practice caused significant economic harm to United because Lab Defendants'

patient brokering inflated out-of-network claims and costs, and caused United to make millions of dollars in payments to Lab Defendants that, unbeknownst to United, were never owed.

126. Lab Defendants' deceptive and unfair practices, as alleged herein, also constitute traditional violations of FDUPTA.

127. Lab Defendants' conduct, as described above, constitutes traditional violations of FDUPTA by deceiving consumers into using Lab Defendants' services through false representations about consumers' payment responsibilities under United's plans, thereby causing United to pay millions of dollars in false and fraudulent charges.

128. Lab Defendants knew or reasonably should have known that members' plans required the members to pay a portion of the charges that Lab Defendants submitted to United in the form of copayments, deductibles, and coinsurance. However, Lab Defendants engaged in a fee-forgiving scheme designed to bill United for inflated charges, while waiving the portion of these charges that members were required to pay under the terms of United's plans.

129. Lab Defendants also deceived United by submitting false, inflated charges to United that did not reflect Lab Defendants' actual charges to members. Lab Defendants' fraudulent fee-forgiving scheme has and continues to harm United's business.

130. As a direct and proximate result of the Lab Defendants' deceptive and unfair trade practices, United was damaged in the form of millions of dollars of payments made for services that were falsely and fraudulently billed and/or wrongfully induced.

131. United has suffered injury and damages as a result of Lab Defendants' deceptive and unfair practices.

132. Lab Defendants' unethical billing practices and pattern of kickbacks offend public policy and have harmed United, United's plans, United's plan members, and health care consumers, generally, by artificially inflating the costs of healthcare services for their own pecuniary gain.

**COUNT I-A**

**Deceptive and Unfair Trade Practices (Against Defendant Bradley West)**

133. United incorporates each preceding paragraph as if each was fully stated herein.

134. As described above and herein, Bradley West was a direct and primary participant in Lab Defendants' deceptive and unfair trade practices.

135. Bradley West directly participated in Lab Defendants' violations of the FDUTPA through violations of FSA §§ 501.204 (deceptive and unfair trade practices), 817.234 (false and fraudulent insurance payments), 817.505 (Patient

Brokering), 456.054 (the Anti-Kickback Statute), and 483.245 (lab rebates) and he is thus personally liable for the harm caused by the violations of the FDUTPA.

136. Bradley West was a direct and primary participant in Lab Defendants' unethical and fraudulent billing practices, solicitation of referral sources, distribution of kickbacks to referral sources, and patient brokering, which offend public policy and have harmed United, United's plans, United's plan sponsors, United's members, and health care consumers, generally, by artificially inflating the costs of healthcare services for his own pecuniary gain.

137. Bradley West directly benefitted from Lab Defendants' deceptive and unfair practices through his ownership interests in Lab Defendants.

138. As a direct and proximate result of Bradley West's involvement in Lab Defendants' deceptive and unfair trade practices, United was damaged in the amount of payments made for services that were falsely, fraudulently, or deceptively billed and/or wrongfully induced.

**COUNT I-B**

**Unfair and Deceptive Business Practices (Against Defendant Lance Hupfeld)**

139. United hereby incorporates paragraphs 1 through 132 as if each was fully stated herein.

140. Lance Hupfeld was a direct and primary participant in the Lab Defendants' deceptive and unfair trade practices.

141. Lance Hupfeld directly participated in Lab Defendants' violations of the FDUTPA through violations of FSA §§ 501.204 (deceptive and unfair trade practices), 817.234 (false and fraudulent insurance payments), 817.505 (Patient Brokering), 456.054 (the Anti-Kickback Statute), and 483.245 (lab rebates) and he is thus personally liable for the harm caused by the FDUPTA violations.

142. Lance Hupfeld was directly and primarily involved in Lab Defendants' unethical billing practices, kickbacks, and patient brokering, which offend public policy and have harmed United, United's plans, United's plan sponsors, United's members, and health care consumers, generally, by artificially inflating the costs of healthcare services for his own pecuniary gain.

143. Lance Hupfeld directly and indirectly benefitted from Lab Defendants' deceptive and unfair practices through his direct and/or indirect ownership interests in Lab Defendants.

144. As a direct and proximate result of Lance Hupfeld's involvement in Lab Defendants' deceptive and unfair trade practices, United was damaged in the amount of payments made for services that were falsely, fraudulently, or deceptively billed and/or wrongfully induced.

## COUNT I-C

**Unfair and Deceptive Business Practices (Against Defendant Dr. Wade White)**

145. United hereby incorporates paragraphs 1 through 132 as if each was fully stated herein.

146. Dr. White was a direct and primary participant in the Lab Defendants' deceptive and unfair trade practices.

147. Dr. White directly participated in Lab Defendants' violations of the FDUTPA through violations of FSA §§ 501.204 (deceptive and unfair trade practices), 817.234 (false and fraudulent insurance payments), 817.505 (Patient Brokering), 456.054 (the Anti-Kickback Statute), and 483.245 (lab rebates) and he is thus personally liable for the harm caused by the violations of the FDUTPA.

148. Dr. White was a direct and primary participant in Lab Defendants' unethical billing practices, kickbacks, and patient brokering, which offend public policy and have harmed United, United's plans, United's plan sponsors, United's members, and health care consumers, generally, by artificially inflating the costs of healthcare services for his own pecuniary gain.

149. Dr. White directly benefitted from Lab Defendants' deceptive and unfair practices through his ownership interests in Lab Defendants.

150. As a direct and proximate result of Dr. White's involvement in Lab Defendants' deceptive and unfair trade practices, United was damaged in the

amount of payments made for services that were falsely, fraudulently, or deceptively billed and/or wrongfully induced.

**COUNT II – Conspiracy To Unlawfully Obtain Funds From United Through Violations of FDUPTA**

**(Against Sky Toxicology, Ltd., Referring Defendants, Jeffrey Cohen, and LLJ Consulting, Inc.)**

151. United hereby incorporates paragraphs 1 through 132 as if each was fully stated herein.

152. Sky Toxicology, Ltd. has conspired with addiction treatment facility owners and operators (including Elements Behavioral Health, Inc., Solid Landings, LLC, South Florida Recovery Center, LLC, Kory Avarell, Elizabeth Perry, Stephen Fennelly, Ferriel Consulting Group, Inc.) and others (Jeffrey Cohen, LLJ Consultants, Inc.) to unlawfully obtain funds from United through violations of FDUPTA, including unfair and deceptive practices, illegal kickbacks, patient brokering, and fraud.

153. The coconspirators' common purpose is to unlawfully obtain funds from private payors, like United, through reimbursements on UA tests induced or caused by deceptive and unfair trade practices.

154. The conspiracy's scope includes illegal kickbacks to attract, induce, and maintain UA test referrals to Sky Toxicology, Ltd., fraudulent, unauthorized,

or unnecessary UA test referrals to Sky Toxicology, Ltd., and the systematic waiver of members' payment responsibilities, all of which caused and/or contributed to Sky Toxicology, Ltd.'s collection of payments from United.

155. Sky Toxicology, Ltd. conspired with Elements Behavioral Health, Inc., Solid Landings, LLC, South Florida Recovery Center, LLC, Kory Avarell, Elizabeth Perry, Stephen Fennelly, Ferriel Consulting Group, Inc., Jeffrey Cohen, LLJ Consulting, Inc., and other Doe Defendants to unlawfully obtain funds from United and other private payors through violations of FDUPTA. These coconspirators agreed with Sky Toxicology, Ltd. to engage in the conspiracy to unlawfully obtain funds from United through unlawful acts and took the following overt actions in pursuance of the conspiracy:

a. Elements Behavioral Health, Inc. took overt acts in pursuance of the conspiracy by causing thousands of UA tests taken from patients at its addiction treatment facilities, including those within Florida, to be referred to Sky Toxicology, Ltd. and signed a Subscription Agreement formalizing its kickbacks from Sky Toxicology, Ltd. on 8/16/2013;

b. South Florida Recovery Center, LLC took overt acts in pursuance of the conspiracy by referring UA tests to Sky Toxicology, Ltd. in exchange for kickbacks to its related entity, Defendant Ferriel

Consulting Group, Inc., which signed a Subscription Agreement formalizing its kickbacks from Sky Toxicology, Ltd. on 2/27/2014;

c. Kory Avarell took overt acts in pursuance of the conspiracy by causing thousands of UA tests taken from patients at an addiction treatment facility in which he or she is an owner and/or shareholder, Above It All, to be referred to Sky Toxicology, Ltd. and signed a Subscription Agreement formalizing his or her kickbacks from Sky Toxicology, Ltd. on 3/16/2014;

d. Elizabeth Perry took overt acts in pursuance of the conspiracy by causing thousands of UA tests taken from patients at her addiction treatment facility, Solid Landings, LLC, to be referred to Sky Toxicology, Ltd. and signed a Subscription Agreement formalizing her kickbacks from Sky Toxicology, Ltd. on 4/22/2014;

e. Stephen Fennelly took overt acts in pursuance of the conspiracy by causing thousands of UA tests taken from patients at his addiction treatment facility, Solid Landings, LLC, to be referred to Sky Toxicology, Ltd. and signed a Subscription Agreement formalizing his kickbacks from Sky Toxicology, Ltd. on 4/22/2014;

f. Ferriel Consulting Group, Inc. took overt acts in pursuance of the conspiracy by accepting kickbacks from Sky Toxicology, Ltd. in

exchange for UA test referrals from South Florida Recovery Center, LLC and signed a Subscription Agreement formalizing its kickbacks from Sky Toxicology, Ltd. on 2/27/2014;

g. Jeffrey Cohen took overt acts in pursuance of the conspiracy by creating PowerPoint documents and giving presentations encouraging referral sources to join Sky Toxicology, Ltd.;

h. LLJ Consulting, Inc. took overt acts in pursuance of the conspiracy by acting as a conduit through which referral sources receive their illegal kickbacks and making distributions to those Doe Defendant referral sources.

156. Sky Toxicology and Referring Defendants have committed thousands of tortious acts in pursuance of the conspiracy in Florida, which have targeted and harmed Floridians. For example:

a. During a three-month period in 2014, Florida-based coconspirators made more than 1,000 unlawful referrals to Sky Toxicology, Ltd. These unlawful acts resulted in Sky Toxicology, Ltd. receiving more than $3.8 million from Florida-based health plans during that period;

b. Sky Toxicology, Ltd. committed many tortious acts in Florida in pursuance of this conspiracy, by sending agents to Florida and

offering to pay distributions to induce the referral of patients and patronage to Sky Toxicology, Ltd.;

c. South Florida Recovery Center, LLC committed several tortious acts in Florida in pursuance of this conspiracy, through its referral of UA tests to Sky Toxicology, Ltd., which constitute FDUPTA violations;

d. Ferriel Consulting Group, Inc. committed several tortious acts in Florida in pursuance of the conspiracy, through its acceptance of payments from Sky Toxicology, Ltd. in exchange for UA test referrals sent by South Florida Recovery Center, LLC, which constitute FDUPTA violations.

157. Each coconspirator received significant sums from Sky Toxicology, Ltd., which were unlawfully obtained from United and other private payors as a result of coconspirators' unlawful acts in furtherance of this conspiracy.

158. The unlawful practices committed pursuant to this conspiracy have damaged United by causing it to make more than $30 million in payments to Sky Toxicology, Ltd. on claims for UA tests that were the product of unlawful, unfair, and deceptive practices.

159. Coconspirators have acted with malice, moral turpitude and wantonness in carrying out their conspiracy to unlawfully obtain funds from United.

## COUNT III – Fraud

## (Against Lab Defendants and General Partner Defendants)

160. United hereby incorporates paragraphs 1 through 115 as if each was fully stated herein.

161. The charges contained in the claims submitted to United by or on behalf of Lab Defendants are material information to United's determination of the amount of benefits, *i.e.*, payment amount, on the claim.

162. The waiver of a member's payment responsibility is likewise material information to United's determination of the amount of benefits, *i.e.*, payment amount owed, on the claim.

163. That referral sources have a financial interest in the Lab Defendant submitting the claim is also material information to United's determination of the amount of benefits, *i.e.*, payment amount owed, on the claim.

164. Whether the services reflected in such claims were medically necessary and/or authorized is also material information to United's analysis of the payments owed on the submitted claims.

165. Between 2011 and 2016, when Lab Defendants submitted claims to United for reimbursement, Lab Defendants knew that the claims contained material misrepresentations regarding Lab Defendants' charges for services reflected in those claims.

166. Between 2011 and 2016, Lab Defendants knew and intentionally failed to disclose material information, regarding the manner, extent, and nature by which Lab Defendants waived United members' payment responsibilities, regarding the Referring Defendants' financial interests in Lab Defendants, and/or regarding the lack of medical necessity and/or lack of authorization for services reflected in those claims.

167. Until the time United's fraud investigation unit conducted an investigation of Lab Defendants' billing practices, United did not know that Lab Defendants had a pattern and practice of waiving members' payment responsibilities and engaging in fee-forgiving.

168. Lab Defendants submitted claims to United, including those identified in Exhibits B through F, with the intent to induce United to rely on Lab Defendants' material misrepresentations and omissions alleged herein and to provide benefits, *i.e.*, make payments, based on those fraudulent claims.

169. United reasonably relied on such material misrepresentations and omissions and provided benefits, *i.e.*, made payments, on the false and misleading claims submitted by Lab Defendants.

170. As a result of their fraudulent conduct, Lab Defendants received payments in excess of $50 million from United.

171. Lab Defendants acted intentionally and in conscious disregard of the rights of United, plan sponsors, and plan members, as Lab Defendants knew that their acts and conduct, as alleged herein, were fraudulent and would result in severe financial injury.

172. United has been damaged as a result of Lab Defendants' fraudulent conduct and is entitled to an award of punitive damages in an amount to be determined at trial.

173. Pursuant to F.S.A. § 620.1404, General Partner Defendants are liable for their respective Lab Defendant's tortious acts and resulting obligations.

**COUNT IV – Negligent Misrepresentation**

**(Against Lab Defendants and General Partner Defendants)**

174. United hereby incorporates paragraphs 1 through 115 as if each was fully stated herein.

175. The charges contained in the claims submitted to United by or on behalf of Lab Defendants are material information to United's determination of the amount of benefits, *i.e.*, payment amount, on the claim.

176. Whether the services reflected in such claims were medically necessary and/or authorized is also material information to United's determination of the amount of benefits, *i.e.*, payment amount, on the claim.

177. Lab Defendants submitted claims to United that did not reflect the real charges that Lab Defendants intended to collect from members and Lab Defendants should have known that these representations were false.

178. Lab Defendants submitted claims to United for services implying that the services were medically necessary and authorized, but the services were not, in fact, medically necessary and/or authorized, and Lab Defendants should have known that such services were not medically necessary and/or unauthorized.

179. Lab Defendants intended and expected United to rely on the claims, which contained false prices, services that were not medically necessary or authorized, and failed to disclose the kickbacks being paid in exchange for the referrals to Lab Defendants, in determining members' benefits for the services, *i.e.*, the payment amount owed on the claims.

180. United did, in fact, rely on the claims submitted by Lab Defendants in making determinations on the benefits, *i.e.*, payments, owed on the claims and, as a result, has suffered significant damage.

181. Pursuant to F.S.A. § 620.1404, General Partner Defendants are liable for their respective Lab Defendant's tortious acts and resulting obligations.

**COUNT V – Tortious Interference with Contract**

**(Against Lab Defendants and General Partner Defendants)**

182. United hereby incorporates paragraphs 1 through 115 as if each was fully stated herein.

183. Lab Defendants' conduct constitutes tortious interference with contract.

184. Each of the members for whom Lab Defendants submitted claims and received payment from United received health care benefits pursuant to a benefit plan insured and/or administered by United.

185. The plans pursuant to which Lab Defendants submitted claims and received payment contained, among other things, provisions that required members to satisfy their payment responsibility (*e.g.*, co-payments, deductibles and co-insurance) in order for the plan to cover a portion of the submitted charges for services.

186. Lab Defendants knew or reasonably should have known that their patients' plans required the patients to satisfy their payment responsibilities (in the form of copays, deductibles, and/or coinsurance) in order for the plan to provide benefits for the charges that Lab Defendants submitted to United.

187. Despite this knowledge, Lab Defendants engaged in a fee-forgiving scheme designed to bill United exorbitant charges, while waiving the portion of

these charges that the patients were required to pay under the terms of their respective plans.

188. Lab Defendants' conduct as described herein caused United's members to violate the terms of their plans and those breaches have resulted in significant harm to United because of unnecessary payments to Lab Defendants.

189. In addition, upon information and belief, Lab Defendants paid kickbacks to providers in United's network to encourage those providers to refer patients to Lab Defendants for testing, even though United's contracts with its providers require the providers to refer patients to in-network providers for non-emergency services like the ones provided by Lab Defendants.

190. Thus, Lab Defendants caused those in-network providers to breach the terms of their contracts with United.

191. Lab Defendants' tortious interference has caused damages to United by causing it to make approximately $50 million in overpayments to Lab Defendants.

192. Lab Defendants have caused further damages to United by causing United's in-network providers to violate the terms of their contracts with United by referring patients to Lab Defendants.

193. Pursuant to F.S.A. § 620.1404, General Partner Defendants are liable for their respective Lab Defendant's tortious acts and resulting obligations.

## **COUNT VI – Unjust Enrichment**

## **(Against Lab Defendants and General Partner Defendants)**

194. United hereby incorporates paragraphs 1 through 115 as if each was fully stated herein.

195. Lab Defendants have been unjustly enriched as a result of their fraudulent billing practices.

196. United's plans are not required to cover charges that members are not billed, are not obligated to pay, or for which they would not have been billed if they did not have insurance.

197. United's plans are also not required to cover amounts that exceed the Eligible Expenses, as that term is defined in the plans.

198. United's plans are also not required to cover services that are not medically necessary.

199. Lab Defendants submitted claims to United falsely stating charges for services rendered to United's plan members.

200. Lab Defendants submitted claims to United for services that were not medically necessary.

201. Additionally, the amounts paid by United and received by Lab Defendants through their schemes described above were the direct result of numerous violations of Florida and Federal law.

202. In reliance upon statements and misrepresentations made by Lab Defendants, United processed benefits and paid claims for services submitted by Lab Defendants and, as a result, Lab Defendants received payments in excess of $50 million from United.

203. Under these circumstances, Lab Defendants were not entitled to seek, collect, or retain the payments they received from United. Lab Defendants have not returned the payments to United.

204. The money Lab Defendants received from United belongs in equity and good conscience to United's plans and their sponsors.

205. Pursuant to F.S.A. § 620.1404, General Partner Defendants are liable for their respective Lab Defendant's tortious acts and resulting obligations.

**COUNT VII – Money Had and Received**

**(Against Lab Defendants and General Partner Defendants)**

206. United hereby incorporates paragraphs 1 through 115 as if each was fully stated herein.

207. Lab Defendants wrongfully billed for services in an amount greatly in excess of the reasonable billed charges for the same services in the relevant market. By routinely charging these excessive fees, Lab Defendants gouged United, its members, and their plans.

208. Furthermore, in reliance upon misrepresentations made by Lab Defendants, United paid claims for reimbursement submitted by Lab Defendants that it would not have paid but for the wrongful conduct of the Defendants.

209. Lab Defendants routinely waived in whole or in part members' financial responsibility under their United plans and in turn billed United as if no such waiver had occurred.

210. Lab Defendants also knew and intentionally failed to disclose that their claims for services were the direct result of a patient-referral kickback scheme that violated the laws of Florida and Texas, among other states.

211. Based on the acts and omissions of Lab Defendants, United processed and paid benefits for services as though they were covered under the plans, when in fact they were not.

212. Lab Defendants have received in excess of $50 million from United, but were not entitled to seek, collect, or retain the payments they received from United. Lab Defendants have not returned the payments to United.

213. The money Lab Defendants received from United belongs in equity and good conscience to United's plans and their sponsors. United seeks to recover all payments that have been made to Lab Defendants.

214. Pursuant to F.S.A. § 620.1404, General Partner Defendants are liable for their respective Lab Defendant's tortious acts and resulting obligations.

**COUNT VIII – Other Equitable Relief**

**and Injunctive Relief under ERISA 502(a)(3)**

215. United hereby incorporates paragraphs 1 through 115 as if each was fully stated herein.

216. With respect to the ERISA-governed plans United insures or administers, United acts as a claims fiduciary, either as a third-party administrator of employer-sponsored and employer-funded group health benefit plans, or as an insurer of employer-sponsored group health benefit plans.

217. Under the relevant plans, United is an ERISA fiduciary and has the authority to review and make decisions on claims for benefits under the applicable plans. As claims administrator, United is an ERISA fiduciary and has standing to sue under Section 502(a)(3) of ERISA to obtain appropriate equitable relief and enforce the terms of the ERISA governed plans.

218. The services provided by Lab Defendants do not constitute covered services under the relevant health and welfare benefit plans.

219. Lab Defendants were not entitled to seek, collect, or retain the payments they received from United. Lab Defendants have not returned the payments to United.

220. The ERISA-governed plans grant United, as an ERISA fiduciary, the right to recover payments made under the plans.

221. Pursuant to ERISA and the express terms of the plans, United is entitled to recover the overpayments made to Lab Defendants. United seeks to recover all overpayments that have been made to Lab Defendants.

222. These overpayments were made directly by United to Lab Defendants.

223. Without limitation, United seeks (i) a constructive trust over the payments that United made to the Lab Defendants, (ii) an order requiring the return of such funds, and (iii) a constructive trust over any such funds in the possession or control of the Lab Defendants as a result of the fraudulent conduct specified herein.

224. Additionally, United seeks a permanent injunction directing Lab Defendants and any related companies to submit to United only charges that Lab Defendants actually charge and intend to collect from members and not to submit charges that include amounts that Lab Defendants do not actually require members to pay (including, without limitation, the waiver of any portion of a member's required coinsurance, copayment, or deductible).

## **COUNT IX – Declaratory Relief**

225. United hereby incorporates paragraphs 1 through 115 as if each was fully stated herein.

226. Lab Defendants purport to provide UA testing services to patients who are covered under plans that are insured or administered by United.

227. Lab Defendants submitted, and continue to submit, claims for reimbursement for UA testing services provided to patients who are members of plans that are insured or administered by United.

228. In addition to claims previously paid, Lab Defendants have submitted millions of dollars in additional claims (based on billed charges) for reimbursements, which have been denied by United.

229. As described in the preceding paragraphs, Lab Defendants submitted claims containing charges that are not covered under the relevant plans because: (a) the charges would not have been billed except for the fact that the plan members were covered under a plan; (b) Lab Defendants failed to bill and fully obligate the appropriate amount of patient responsibility from members based on the charges submitted to United; (c) Lab Defendants' patient-referral kickback scheme violates applicable laws; and (d) many claims were for tests that were unauthorized and/or not medically necessary.

230. As a result, all the claims submitted by Lab Defendants are not reimbursable, and any payments Lab Defendants received because of such claims should be returned to United. Despite that fact, Lab Defendants have not returned the payments United previously made to Lab Defendants.

231. An actual controversy exists between Lab Defendants and United regarding whether claims for reimbursement are covered and payable under

employee health and welfare benefit plans that are insured and/or administered by United.

232. Pursuant to Florida law and Section 502(a)(3) of ERISA, United seeks a declaration that the claims for reimbursement submitted by Lab Defendants are not for covered services, per the plans' summary plan descriptions, and are thus not payable under the employee health and welfare benefit plans that are insured and/or administered by United.

233. Likewise, United also seeks a declaration that Lab Defendants must return all sums received from United.

234. United also seeks recovery of its reasonable and necessary attorneys' fees and costs.

## VI. DISCOVERY RULE

235. United incorporates each preceding paragraph as if each was fully stated herein.

236. United did not know and could not have known, despite the exercise of reasonable diligence, of all the facts underlying its claims prior to bringing this lawsuit.

## PRAYER FOR RELIEF

237. Wherefore, Plaintiffs respectfully request that Defendants be cited to appear and answer and that the Court enter Judgment against Defendants for the following:

a. An award of both actual and consequential damages;
b. Statutory treble damages;
c. An award of punitive and exemplary damages;
d. Equitable relief as requested herein;
e. Declaratory and injunctive relief as requested herein;
f. Reasonable and necessary attorneys' fees;
g. Costs of court;
h. Prejudgment and post-judgment interest; and
i. Such other and further relief at law or in equity to which Plaintiffs may be justly entitled.

JURY TRIAL IS DEMANDED ON ALL ISSUES SO TRIABLE.

Respectfully submitted, this 25th day of April, 2016,

**WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC**

/s/Stephen W. Mooney
STEPHEN W. MOONEY
Florida Bar No: 41678
MICHAEL A. HORNREICH

Florida Bar No.: 379972
2601 South Bayshore Drive, Suite 1500
Miami, Florida 33133
Telephone: 407-734-7000
Email: smooney@wwhgd.com
Email: mhornreich@wwhgd.com